UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JUAN MANUEL GARCIA-MERINO, | ) | SA-CV 06-0102 SVW (RCx) |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | COURT'S FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| v. | ) | |
| | ) | JS6 |
| | ) | |
| PATTI IRVIN, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## I.  INTRODUCTION

Juan Manuel Garcia-Merino ("Plaintiff") filed this action alleging a violation of his Eighth Amendment right to be free from cruel and unusual punishment.  Plaintiff's claim arises out of the alleged failure of a primary care physician, Dr. Jesus Fernandez, and an administrator, Stacey Allen, (collectively, "Defendants") to schedule a

surgery allegedly required to repair a fracture in Plaintiff's hand while Plaintiff was incarcerated at the Federal Correctional Institute I, in Victorville, California ("FCI 1").  Plaintiff also named other defendants; however, the Court previously granted summary judgment on qualified immunity grounds to these defendants.  Stacey Allen was also granted summary judgment on qualified immunity grounds only with respect to his actions taken prior to his investigation of Plaintiff's December 28, 2005 administrative complaint.

The Court held a four-day trial on November 16-17, 2010 and December 9-10, 2010.  Having heard the evidence at trial, reviewed the submitted direct examination testimony, and examined the record, the Court finds that Defendants did not violate Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.

The essence of Plaintiff's claim is that Defendants caused delays in providing his prescribed hand surgery, resulting in unnecessary pain and permanent damage to his hand.  Plaintiff claims that Dr. Fernandez permanently deferred to a specialist's (Dr. Puri's) recommendation for surgery, and failed to oversee that the surgery took place in a timely manner.  The Court finds that initially, Dr. Fernandez did defer to the recommendation for surgery, though he was aware that treating Plaintiff with a splint and painkillers would be medically acceptable.  However, Dr. Fernandez did not exhibit deliberate indifference toward Plaintiff because Dr. Fernandez, following established protocol, forwarded surgery requests to a third party scheduler.  Plaintiff has not demonstrated that Dr. Fernandez had authority to follow up and ensure the surgery had taken place once Dr. Fernandez forwarded surgery requests for scheduling.

Even if Dr. Fernandez had authority to ensure surgeries had in fact taken place once he approved and forwarded a surgery recommendation, Plaintiff has not shown he was not deliberately indifferent.  Dr. Fernandez continued to send Plaintiff to hand specialists for evaluation and surgery once he discovered that the original surgery had not been properly scheduled.  However, no other specialist recommended surgery for Plaintiff.  This confirmed Dr. Fernandez's own medical opinion that a splint and painkillers were medically acceptable treatment, and Dr. Fernandez continued to treat Plaintiff in a medically acceptable manner while Plaintiff was at FCI 1.  Plaintiff has not met his burden in showing Dr. Fernandez's method of treatment was medically unacceptable.

As to Defendant Allen, Plaintiff essentially alleges that Allen caused a delay in his prescribed surgery by failing to oversee that he received the surgery once it was scheduled.  However, Plaintiff has not demonstrated that surgery was his prescribed treatment by the time Allen became involved.  Allen wrote a memorandum concerning Plaintiff's medical idle status and worker's compensation in December 2005, well after the alleged delays in surgery.  Plaintiff has not shown that Allen had a responsibility to ensure that Plaintiff received surgery in this memorandum.  Furthermore, Plaintiff has not shown that Allen's memorandum suggests he was deliberately indifferent to Plaintiff's medical needs.

Finally, even if Plaintiff had demonstrated that Defendants were deliberately indifferent to his serious medical needs, Plaintiff has not demonstrated that Defendants caused him any harm.  Any pain Plaintiff experienced was treated with painkillers and a necessary part

of the healing process.  Furthermore, Plaintiff's hand healed in a medically acceptable fashion, without permanent damage.

## II.  FINDINGS OF FACT

Plaintiff was incarcerated at FCI 1 from November 8, 2002 through February 9, 2007.  Plaintiff injured the base of his ring finger in his right hand on May 14, 2005.  Plaintiff went to the prison medical facility the same day, where a physician's assistant, Ms. Lilia Castillo, ordered x-rays, wrapped the hand with an elastic bandage, and gave Plaintiff a prescription for Ibuprofen for his pain.  The physician assistant's injury assessment report noted the "need to rule out a fracture" of Plaintiff's hand.  One or two days later, Defendant Dr. Fernandez, the treating physician on call, reviewed and approved the injury assessment report and signed off on the treatment, including the need for x-rays.[1]

During the next ten days following the injury, Plaintiff informed Mr. Louis Sterling, an Assistant Health Services Administrator,[2] on three occasions that Plaintiff needed an x-ray on his hand.  Plaintiff also discussed his injury with Dr. Fernandez following the injury.  Dr. Fernandez told Plaintiff to talk to the Physician's Assistant at Health

---

[1] As a medical officer, it was Dr. Fernandez's duty to ensure that inmates received proper medical care.  Dr. Fernandez was responsible for Plaintiff's medical treatment.  Exs. 57-3, 57-4.  Dr. Fernandez was employed as a medical officer at FCI 1 in 2005 and 2006. Fernandez Dec. ¶¶ 2-5.

[2] Assistant Health Services Administrators ("AHSAs") have administrative supervisory duties over mid-level practitioners and personnel involved with medical records, laboratories, x-rays, and pharmacies. Ex. 21-2. Other duties include fiscal management, personnel management, public relations, working collaboratively with physicians in evaluating and revising program plans, and prison security.  Ex. 21.

Services.  Plaintiff went to Health Services regularly during this two-week period.

Officials in Health Services took x-rays of Plaintiff's hand on May 24, 2005.  The x-rays confirmed a fracture in the fourth metacarpal bone in his right hand  – the bone at the base of the ring finger. Plaintiff's hand was placed in a splint.  Two days later, on May 26, Plaintiff was examined by an orthopedic surgeon, Doctor Rajiv Puri, for a follow-up requested by Dr. Fernandez for a prior knee and ankle surgery.  Ex. 7.  Dr. Fernandez personally attended this meeting. Medical staff at FCI 1 requested that Dr. Puri examine Plaintiff's hand at this meeting in addition to the follow-up examination.

Dr. Puri was a contract consultant for Medical Development International, Ltd ("MDI"), a company that contracted with the Bureau of Prisons ("BOP").  MDI contracted with physicians to perform medical consultations at FCI 1 as needed per its agreement with the BOP.  As a contractor with MDI, Dr. Puri provided orthopedic specialty services at the prison in 2004 and 2005.  Puri voluntarily ended his agreement to provide services for BOP through MDI sometime in July, 2005, after his last trip to FCI 1 on July 12.

At the time of this meeting on May 26, 2005, Dr. Puri determined that the fracture in Plaintiff's hand was "angulated" by a visual examination of Plaintiff's hand and by examining the May 24, 2005 hand x-rays.  Dr. Puri's notes acknowledged that Plaintiff's hand was on a splint, but do not indicate that Dr. Puri was aware that Plaintiff was receiving Ibuprofen.[3]  Ex. 7.  Dr. Puri prescribed open reduction

---

[3] However, Ms. Castillo's notes from her consultation with Plaintiff on May 14, 2005, were in Plaintiff's file.  These notes indicate that Plaintiff was receiving Ibuprofen.  Ex. 1.  Dr. Puri had access to

internal fixation ("ORIF") surgery to treat the fracture.  Dr. Puri believed the ORIF surgery was necessary because the fracture would otherwise take a long time to heal and subject Plaintiff to pain during the healing process.  Further, Dr. Puri believed that without the surgery, there was a chance that the fracture could heal improperly, causing problems such as decreased grip strength and disfigurement. Dr. Puri testified that his usual practice is to indicate a need for pain medication in his notes if he feels the prisoner needs pain medication.  However, despite the fact that pain is greatest soon after the fracture, Dr. Puri did not indicate Plaintiff needed stronger pain medication than Ibuprofen or prescribe any medication on May 24, 2005. Trial Transcript Vol. 3 at 9: 7-22.  In fact, Dr. Puri's notes do not refer to pain.

Defendant Dr. Fernandez had accompanied Plaintiff to the examination room where the Plaintiff's meeting with Dr. Puri took place.  Dr. Puri made notes of the examination and prepared a recommendation for surgery to be performed on June 2, 2005.  Ex. 7. The notes do not indicate any sense of urgency, but state simply that Plaintiff had a fracture in his fourth metacarpal bone and that he was recommended "for ORIF on 6/2/05."  Ex. 7.  The notes do not mention pain.  Dr. Puri indicated to Dr. Fernandez that he selected the June 2, 2005 date because the date was particularly convenient in his schedule. Trial Transcript Vol 3. at 11:11-14; Fernandez Dec. ¶ 9.  Dr. Puri did not indicate that he felt it was urgent that Plaintiff receive the

this file and presumably reviewed these notes.  To the extent Dr. Puri did not review these notes, the record does not show that Dr. Puri would have been aware that Plaintiff was receiving any pain medication.

surgery.  Trial Transcript Vol 3. at 10:25; 11:1-14; Fernandez Dec. ¶ 9.  Dr. Fernandez prepared a written request for surgery (a "form 513") and wrote "ASAP" on the request.  Ex. 6.  Dr. Puri's testimony at trial and Dr. Fernandez's testimony confirm that Dr. Fernandez wrote "ASAP" on the request because of the proximity of the June 2 date, rather than any belief that it was urgent that Plaintiff receive the surgery.  Trial Transcript Vol 3. at 10:25; 11:1-4; Fernandez Dec. ¶ 15.  Dr. Fernandez then delivered the form 513 to the medical secretary for scheduling.  The medical secretary then faxed the form to MDI, which was received by MDI on May 31, 2005.  Ex. 6.

MDI was responsible for contacting an outside specialist to schedule the surgery.  MDI was also responsible for confirming with the secretary, Ms. Kline, at FCI 1 that the appointment had been scheduled.  Sterling Dep. at 68; Allen Dec. ¶ 4; Kline Dep. at 19-25; Fernandez Dec. ¶ 19.  In the past, Dr. Fernandez called service providers to reschedule cancelled appointments directly out of concern for inmates' urgent medical needs, Kline Dep. at 41, but he was reprimanded as he does not have authority to schedule appointments.  Fernandez Dec. ¶ 23.

Dr. Fernandez assumed that the medical secretary had contacted MDI and that the procedure had been scheduled.  For security reasons, inmates are not given advance notice of when they will be leaving the facility for scheduled appointments.  Kline Dep. at 43.  If an inmate knew of a trip, Ms. Kline would be required to cancel the appointment and reschedule.  Kline Dep. at 43.  To avoid disclosing this information, Dr. Fernandez did not keep records of outside appointments and did not know exactly when Plaintiff's surgery was scheduled.

The surgery on June 2, 2005 with Dr. Puri was never scheduled by MDI for unknown reasons.  MDI scheduled Dr. Puri's appointment with another surgeon, Dr. George T. Craig, for a date well after June 2, 2005.  Dr. Fernandez was not responsible for MDI's scheduling decision. Dr. Fernandez was not informed by Dr. Puri or MDI that the surgery was not scheduled for June 2, 2005.  During the relevant period there was no system or policy in place to notify a physician that a scheduled appointment had been changed or canceled.  Fernandez Dec. ¶ 27; Allen Dec. ¶ 6.

On June 28, 2005, the MDI scheduler advised Ms. Kline that the surgery was scheduled with Dr. Craig and that Dr. Craig had to cancel his upcoming appointment because he would be out of the office.  The appointment was scheduled for August 4, 2005.  Kline Dep. 61. Meanwhile, on July 2, 2005, Plaintiff contacted Mr. Louis Sterling, the Assistant Health Services Administrator at FCI 1, asking when the surgery recommended by Dr. Puri would be performed.  Mr. Sterling informed Plaintiff that he would be seen by Dr. Craig.

On July 12, 2005, while Plaintiff's appointment with Dr. Craig was still pending, Dr. Puri met with Plaintiff for a second time on a routine visit to FCI 1.  Dr. Puri wrote in Plaintiff's chart that Plaintiff had a malunited fracture in the right fourth metacarpal.  At trial, Dr. Puri indicated that the optimal period for ORIF surgery was within six weeks of the fracture, because new bone (known as a "callus") could have formed by six weeks, beginning the natural healing process.  Dr. Puri also indicated that because he did not have a current set of x-rays, he was uncertain "whether the fracture had or had not actually healed as of July 12, 2005."  Puri Dec. ¶ 23.

Nonetheless, Dr. Puri recommended surgery because Plaintiff told him that the "bump" on his hand was hurting, and because Plaintiff was concerned about the fact that the knuckle was missing.  Dr. Puri 's notes affirm his reasoning: "Insists on correcting the malunion. Painful bump.  Adv[ised] will remove the bump, but no guarantee for restoring the knuckle[.] For ORIF [fracture] [right] 4th [metacarpal]." Ex. 9.  At trial, Dr. Puri explained that when he wrote "insists on correction of the malunion," he was referring to the Plaintiff insisting on the surgery.  Trial Transcript Vol. 3 at 13:14-19. Further, the notation regarding a "painful bump" was based on Plaintiff informing Dr. Puri that the "bump" was hurting him.  Puri Dec. ¶¶ 27-28.  Dr. Puri did not prescribe pain medication or indicate stronger pain medication than Ibuprofen was needed.  Dr. Puri placed his recommendation in Plaintiff's file and had no further contact with Dr. Fernandez.  Dr. Fernandez was not present during the July 12, 2005 meeting.  Aside from the notes and conversation on May 26, 2005, and notes from July 12, 2005 in Plaintiff's file, Dr. Puri did not communicate with Dr. Fernandez about his recommendation for surgery.

Dr. Fernandez reviewed and signed Dr. Puri's second recommendation for surgery.  Dr. Fernandez believed based upon his review of Dr. Puri's July 12, 2005 notes that Dr. Puri was indicating that surgery might remove the bump on Mr. Garcia-Merino's right hand.  Fernandez Dec. ¶ 29.  Dr. Fernandez reasonably interpreted the notes to mean, as Dr. Puri intended to convey, that Plaintiff was "insist[ing] on" the surgery, not Dr. Puri.  Trial Transcript Vol. 1 at 50: 24-25; 51: 1-9. He understood that Dr. Puri warned that the ORIF procedure was "no guarantee" for improvement.  Fernandez Dec. ¶ 29.  The only advantage

for doing the procedure, according to Dr. Puri's notes, was to remove the bump, which Plaintiff claimed was hurting.  Fernandez Dec. ¶ 29.  During the time Dr. Fernandez was responsible for Plaintiff's treatment, Dr. Fernandez was aware that another viable method of treatment was to treat the fracture conservatively by using a splint and Ibuprofen.  Fernandez Dec. ¶ 29.  Nonetheless, Dr. Fernandez approved and forwarded the request for surgery on August 1, 2005, about three weeks after Dr. Puri made his second recommendation for surgery.  Dr. Fernandez did not exercise his independent medical judgment in making this decision.  Despite his reservations regarding the necessity of surgery, he deferred to Dr. Puri's expertise.  Trial Transcript Vol. 1 at 49:17-22; 60: 20-23; 61:8-15.  On August 10, 2005, Mr. Sterling sent an additional 513 on behalf of Dr. Fernandez requesting surgical intervention and evaluation by Dr. Craig.[4]  Sterling Dep. at 142.

After Mr. Sterling contacted MDI and after Dr. Fernandez forwarded the request for surgery on August 1, 2005, MDI rescheduled Plaintiff's appointment with Dr. Craig from September 1, 2005 to September 8, 2005.  Ex. 12.  This change likely occurred because of Dr. Craig's schedule, according to Ms. Kline.  Kline Depo. at 60.  Dr. Fernandez was not responsible for this decision.  Throughout the summer and fall of 2005, Plaintiff made repeated attempts to obtain the prescribed surgery.

On September 8, 2005, Plaintiff was sent off-site to meet with Dr. Craig pursuant to Dr. Fernandez's initial 513 request for surgery.  Dr. Craig, however, chose not to perform the surgery because he wanted more recent x-rays to evaluate whether Plaintiff was a candidate for

---

[4] As an AHSA, Mr. Sterling had the ability to sign 513 request forms on behalf of Dr. Fernandez.

surgery.   Plaintiff was not allowed to travel outside Dr. Craig's office to obtain those x-rays on September 8, 2005 due to security reasons.   Dr. Craig did, however, visually examine Plaintiff's hand on September 8, 2005.   Ex. 122.   The notes stated, "<u>[A]t this time</u>, w[ithout] xray, see no reason for surgery."   Ex. 122-2 (emphasis in original).

Dr. Fernandez was not present at Plaintiff's September 8, 2005 meeting with Dr. Craig. Based on a reading of other portions of Dr. Craig's notes, Dr. Fernandez believed that Plaintiff had good range of motion and strength in his finger.[5]   As Dr. Craig did not indicate surgery was necessary despite Dr. Puri's earlier recommendation for surgery, Dr. Fernandez believed that Plaintiff should continue to be treated with a splint and Ibuprofen until further evaluation.

Dr. Fernandez arranged a follow-up consult for Plaintiff with Dr. Craig after the URC approved further x-rays on September 29, 2005.   Ex. 60.   Dr. Fernandez informed Plaintiff in writing on September 29, 2005, that he would see Dr. Craig again.   Fernandez Dec. ¶¶ 33-34; Ex. 60. The requested x-rays were taken on October 19, 2005, and a radiological report of the x-rays was prepared on October 26, 2005.   The report noted: "MAJOR ABNORMALITY, PHYSICIAN AWARE." Dr. Craig again evaluated Plaintiff on October 31, 2005 and reviewed the radiological report. Ex. 117.   Dr. Craig noted the lack of callus formation based on the x-rays, and stated, "<u>Perhaps</u> . . . there is limited indication to internal[ly] fix this f[racture]. . . . <u>Perhaps</u> could do external

---

[5] Craig's notes are illegible on this point.   Dr. Craig is elderly, infirm and was unable to testify at trial.   The Court finds that Dr. Fernandez's general understanding of Dr. Craig's notes – that Dr. Craig believed that surgery was unnecessary at this time – was credible and supported by the evidence.

manipulation. . . . [T]he f[ractured] bone will never be exactly the same as it was before . . . 5/14/05." Ex. 117-2 (emphasis in original). Dr. Craig mentioned he would forward an additional report, but none was received.

Dr. Fernandez reviewed and stamped Dr. Craig's report on December 14, 2005. Dr. Fernandez could not make out all of Dr. Craig's handwriting, but believed that Dr. Craig was considering several methods of treatment, without having yet reached a conclusion. Fernandez Dec. ¶ 35. Dr. Fernandez believed the external surgical procedure would not have provided any pain relief and Dr. Craig makes no mention of pain in his report. Fernandez Dec. ¶ 35. At this point, Dr. Fernandez became convinced that Dr. Craig would not change his views because he had declined to perform surgery on two occasions and that Dr. Craig's decision affirmed his view that "conservative management" of the fracture would be helpful. Fernandez Dec. ¶¶ 15, 36. Dr. Fernandez, therefore, did not attempt to prod Dr. Craig to send a final report when none was received. Fernandez Dec. ¶ 36.

In the following months, while Plaintiff's splint and painkiller treatment continued, Plaintiff made more requests to prison officials to schedule him for surgery. Plaintiff complained of pain. However, he continued to work and use his right hand. Plaintiff worked at Unicor, a factory at FCI 1. Plaintiff's factory manager, Enrique Ortega, observed Plaintiff using both of his hands to type in May 2005, despite the fact that another inmate was available to assist Plaintiff. Ortega Dep. at 106-111.

Towards the end of 2005, Plaintiff met informally with Dr. Paul Stanton, an orthopedist, on a regular visit to FCI 1. Dr. Stanton

filled in from time to time after Dr. Puri stopped providing services for the BOP.  Dr. Fernandez recalls that Dr. Stanton informally indicated that Plaintiff was not a candidate for surgery.  Fernandez Dec. ¶ 38.

On December 28, 2005, Plaintiff submitted a "Request for Administrative Remedy" to Defendant Allen, a new AHSA who had replaced Mr. Louis Sterling in August 2005.[6]  Plaintiff requested Allen to ensure that FCI 1 "take the necessary steps to place me on work medical idle and supply me with workman's compensation until I have my hand repaired and I am fully recovered." Ex. 31.  Allen investigated Plaintiff's complaint seeking medical idle status and worker's compensation by reviewing Plaintiff's medical file.  Allen then wrote a memorandum to Deputy Warden Holencik notifying him that review of Plaintiff's x-rays revealed something out of the ordinary.  Ex. 34.  Based on his prior experience in the medical field, Allen noted that Plaintiff had sustained a "boxer's fracture," and that the overwhelming majority of such fractures are caused by punching something or someone with a closed fist.  Ex. 34.  Allen believed this information was relevant, because if the cause of the fracture was punching something or someone, Plaintiff would not be entitled to worker's compensation.  Allen Dec. ¶ 12.  Allen also had a duty to report anything out of the ordinary that could raise security concerns.  Allen Dec. ¶ 12; Ex. 21.  The Deputy Warden subsequently denied Plaintiff's request for medical idle status and worker's compensation.  Ex. 124.

---

[6] Allen was employed at FCI 1 from November 1, 2005 until March, 2007.  Allen Dec. ¶ 2.

Plaintiff filed this lawsuit on February 6, 2006.  At the end of March 2006, Dr. Fernandez informed Plaintiff that the requested surgery would not be performed.  Prison officials scheduled Plaintiff to meet with a new doctor as part of defending the lawsuit.  On April 5, 2005, Plaintiff was examined by Dr. Louis Redix, who found that Plaintiff's hand had healed in an acceptable alignment and that no further treatment was necessary.  Dr. Redix sent a follow-up letter to Defendant Fernandez on April 24, 2006, responding to additional questions from Fernandez at the request of his attorneys.  Printed in the upper left corner is the file name of the computer document, "Jesus Fernandez — Merino Stupid Letter.doc," apparently in reference to Plaintiff Garcia-Merino.  Dr. Fernandez reviewed and signed this letter.

Plaintiff was released in February 2007 and deported thereafter. He has not subsequently had any surgery on his hand.  Plaintiff testified at trial via a video link.  He testified that he occasionally still has pain and that his hand is grossly deformed.  The Court did not find Plaintiff's testimony regarding his alleged pain credible. The Court instructed Plaintiff to exhibit his hand at trial and the Court observed no visible deformity.  Dr. Stuart H. Kuschner, Defendants' expert,[7] reviewed Plaintiff's medical charts and opined that

---

[7] The Court notes that Plaintiff objects to Dr. Kuschner's testimony, arguing that it is irrelevant to any issue in the case.  The Court disagrees.  In its Summary Judgment Order, the Court was required to view the evidence in a light most favorable to Plaintiff.  As such, the Court discounted Dr. Fernandez's testimony that he developed an independent medical opinion that a splint and Ibuprofen was medically acceptable treatment.  (Doc. No. 131 at 25).  As a result, the Court concluded, "[A]t the present stage of litigation, this is not a case of conflicting medical judgments about the proper course of treatment."  (Doc. No. 131 at 25).  However, after hearing the

Plaintiff's fracture healed with "good alignment of the bone and good function." Kuschner Dec. ¶ 16.  Dr. Kuschner also testified that a callus, which is a sign of bone formation, is not necessarily visible on an x-ray even though healing is taking place.  Further, the fact that there is no callus formation does not mean the fracture has not united.  Dr. Kuschner also stated, "pain resolves after the fracture has healed and I do not recall seeing residual symptomatology under similar circumstances in patients I have treated."  Kuschner Dec. at ¶ 32.  He opined that Plaintiff was "treated appropriately with nonoperative treatment" and that the fracture healed in "an acceptable position."  Kuschner Dec. ¶ 34.

**II.  CONCLUSIONS OF LAW**

  **A.   Legal Standards**

    **(1)  Eighth Amendment Violation**

Plaintiff's claims for damages against Defendants are permissible under Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).  Plaintiff pursues relief under the Eighth Amendment's proscription against cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).

---

testimony at trial, the Court finds that Dr. Fernandez formed and affirmed his independent medical opinion after Dr. Craig declined to recommend surgery on two occasions.  As such, Dr. Kuschner's testimony is relevant to determine whether the treatment chosen by Dr. Fernandez was medically acceptable and Dr. Fernandez's credibility as to the chosen treatment.  Dr. Kuschner's testimony is also relevant to the issue of whether Plaintiff suffered any harm. Dr. Kuschner stated that pain is a natural part of the healing process and once a fracture like Plaintiff's is healed, he would generally not expect continuing pain.  He also testified that Plaintiff's fracture healed with acceptable alignment.

To succeed on his Eighth Amendment claim, Plaintiff bears the burden to prove that (1) he faced a serious medical need; (2) that the Defendants were "deliberately indifferent" to that medical need; and (3) that the Defendants' failure to act caused him harm.   Ninth Circuit Model Civil Jury Instructions § 9.25 (November 2010); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

An Eighth Amendment violation can exist only if the prisoner's need for medical treatment is "serious."   See Hudson v. McMillian, 503 U.S. 1, 9 (1992).   "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in [1] further significant injury or [2] the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (quoting Estelle, 429 U.S. at 104), *overruled on other grounds by* WMX Techs. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).   In this case, the parties do not dispute that Plaintiff had a "serious medical need" – the need for treatment of Plaintiff's fractured finger.

"Deliberate indifference" is found where an official undertakes "a purposeful act or failure to act" that "ignore[s] or fail[s] to respond to a prisoner's pain or possible medical need." McGuckin, 974 F.2d at 1060.   Deliberate indifference can be shown in one of two ways.   It can be established either [1] with evidence that "prison officials deny, delay or intentionally interfere with medical treatment, or [2] be shown by the way in which prison physicians provide medical care." McGuckin, 974 F.2d at 1059 (quoting Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)).   Under both scenarios, mere negligence is not enough.   Jett, 439 F.3d at 1096.   Instead, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate

16

humane conditions of confinement unless the official knows of and
disregards an excessive risk to inmate health or safety; the official
must both be aware of facts from which the inference could be drawn
that a substantial risk of serious harm exists, and [the official] must
also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

### (2)  Qualified Immunity

Even if the Court finds there was a constitutional violation under
the standard set forth above, Defendants may be entitled to qualified
immunity because the contours of the right at issue were not clearly
established. Saucier v. Katz, 533 U.S. 194, 201 (2001). Qualified
immunity shields government officials "from liability for civil damages
insofar as their conduct does not violate clearly established statutory
or constitutional rights of which a reasonable person would have
known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It protects
officials "from undue interference with their duties and from
potentially disabling threats of liability." Id. at 806.

To be clearly established, the "contours of the right must be
sufficiently clear that a reasonable official would understand that
what he is doing violates that right." Anderson v. Creighton, 483 U.S.
635, 640 (1987).  In determining whether a federal right is clearly
established, the Court first looks to binding precedent from the
Supreme Court or the Ninth Circuit. Mattos v. Agarano, 590 F.3d 1082,
1089 (9th Cir. 2010).  In the absence of binding precedent, the Court
looks to "whatever decisional law is available to ascertain whether the
law is clearly established for qualified immunity purposes, including
decisions of state courts, other circuits, and district courts." Boyd
v. Benton County, 374 F.3d 773, 781 (9th Cir. 2004) (quoting Drummond

v. City of Anaheim, 343 F.3d 1052, 1060 (9th Cir. 2003)) (internal quotations omitted).

There must be "some parallel or comparable fact pattern to alert an officer that a series of actions would violate an existing constitutional right." Fogel v. Collins, 531 F.3d 824, 833 (9th Cir. 2008).  To be established clearly, however, there is no need that "the very action in question [have] previously been held unlawful." Wilson v. Layne, 526 U.S. 603, 615 (1999).  "[O]fficials can still be on notice that their conduct violates established law ... in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).  However, "'if officers of reasonable competence could disagree on [the] issue, immunity should be recognized.'"  Id. (alterations in original) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

**B.    Defendant Dr. Fernandez**

As the parties do not dispute that there was a "serious medical need" to treat Plaintiff's fractured finger, the Court addresses Plaintiff's argument that Dr. Fernandez exhibited deliberate indifference to Plaintiff's need for treatment.  According to Plaintiff, Dr. Fernandez never selected a course of treatment other than making a decision to follow Dr. Puri's recommendation.  Thus, under Plaintiff's theory, this was not a case of conflicting medical opinions.  Sanchez v. Vild, 891 F.2d 240 (9th Cir. 1989) ("A difference of opinion does not amount to a deliberate indifference to . . . serious medical needs.").  The Court agrees that Dr. Fernandez had formed no independent opinion when he deferred to Dr. Puri's request for surgery, though Dr. Fernandez did have his own reservations about whether surgery was necessary.  Nonetheless, the Court does not find

that any delays attributable to Dr. Fernandez show the requisite "deliberately indifference" to Plaintiff's health that would amount to cruel and unusual punishment.  Furthermore, the bulk of the delays were caused by a third-party, MDI, not Dr. Fernandez.  As a result of scheduling errors by MDI, a different expert, Dr. Craig, examined Plaintiff.  Dr. Craig did not prescribe surgery, confirming Dr. Fernandez's initial opinion that Plaintiff was not a candidate for surgery.  Subsequently, Dr. Fernandez provided Plaintiff medically acceptable treatment.

### (1)   Denial, Delay, or Intentional Interference with Treatment

Plaintiff contends that two Ninth Circuit cases, decided at the summary judgment stage, present similar factual situations.  Ultimately, the cases do not support Plaintiff's argument.

In McGuckin v. Smith, 974 F.2d 1050 (9th Cir. 1992), the plaintiff had suffered a back injury in June 1986.  Upon the plaintiff's arrival at a new prison in 1989, a prison doctor, Dr. Smith, examined the plaintiff and prescribed painkillers.  Id.  The plaintiff continued to complain of pain, and after a further examination in early May 1989, Dr. Smith requested a consultation with the other defendant, Dr. Medlen, who was an orthopedic specialist.  Id.  After examining the plaintiff in late May, Dr. Medlen ordered a CT scan or MRI to determine whether or not plaintiff suffered from a herniated disk.  Id.  The requested CT scan was not performed for nearly three months.  Id.  After the CT scan, Dr. Medlen recommended that the plaintiff be admitted for surgery.  Id.  At the end of August 1989, the prison's Outside Referral Committee, following Dr. Medlen's recommendation,

approved the specialist's request for surgery.  Id.  In October 1989,

the plaintiff had still not received the recommended surgery, and

visited Dr. Smith at the prison to complain about his pain.  Id.  The

plaintiff eventually filed a lawsuit in the middle of November and

finally received the recommended surgery in December 1989.  Id. at

1061-62.

In this case, Plaintiff argues that Dr. Fernandez played a role

similar to Dr. Smith in McGuckin.  However, Plaintiff's argument is

unavailing.  Although the Ninth Circuit in McGuckin recognized that

between April and December 1989, the plaintiff had suffered pain and

delay, the court granted summary judgment to defendants.  Id. at 1062.

The court noted that "[t]he vast majority of the delay" took place

while the plaintiff was at a different prison and was under the care of

other doctors.  Id.  The plaintiff did not introduce any evidence that

"either doctor was responsible for the failure to promptly perform the

CT scan," such as evidence that they were "responsible for the

scheduling of such diagnostic examinations."  Id.  The plaintiff failed

to show that the defendants were responsible for "[t]he delay in

surgery."  Id.  Instead, the evidence showed that the "prison referral

committee and prison administrators — not Smith or Medlen — were the

ones who scheduled surgical treatments and were charged with ensuring

that [the plaintiff's] surgery occurred promptly."  Id.  The evidence

suggested that Dr. Medlen had the authority to determine that surgery

was necessary, but did not have the authority to schedule the surgery.

Id. & n.14.

Similarly, in this case, Dr. Fernandez followed established

protocol in approving and forwarding Dr. Puri's surgery requests to the

appropriate body, MDI, to schedule the appointments.  When Dr. Puri initially recommended surgery on May 26, 2005, he did not indicate that Plaintiff was in pain or indicate a sense of urgency to Dr. Fernandez. Dr. Puri did not prescribe stronger pain medication than the Ibuprofen Plaintiff was receiving, further conveying that there was little sense of urgency to Dr. Fernandez.  In fact, Dr. Puri stated at trial that the reason he selected the June 2, 2005 date was simply because it was convenient for his schedule and told Dr. Fernandez so.  In any case, the first request for scheduling to MDI resulting from the May 26, 2005 consult with Dr. Puri was sent by Dr. Fernandez in a timely manner, but for reasons out of Dr. Fernandez's control, MDI did not schedule the surgery on June 2, 2005 with Dr. Puri.  Dr. Fernandez even wrote "ASAP" on the 513 to indicate to schedulers and medical staff that there was a fast approaching surgery date before forwarding the form.  Dr. Fernandez had no responsibility or authority to schedule the surgery beyond approving and forwarding the 513 to MDI.  Dr. Fernandez was not contacted by MDI or Dr. Puri after June 2 passed without the surgery. He reasonably assumed that the surgery had been scheduled.  However, MDI did not schedule the surgery as requested.

After Dr. Puri's second visit on July 12, 2005, Dr. Fernandez learned that the surgery had not been scheduled.  He again approved and forwarded Dr. Puri's second surgery recommendation, which was largely based on Plaintiff's complaints of pain in a bump on his hand. Although Dr. Fernandez did not forward the recommendation until August 1, 2005, a delay of 19 days on its own does not amount to deliberate indifference for Plaintiff's serious medical need.  See Estelle, 429 U.S. at 104 ("[I]n the medical context, an inadvertent failure to

provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'); McGuckin, 974 F.2d at 1060 ("A finding that the defendant's neglect of a prisoner's condition was an isolated occurrence or an isolated exception to the defendant's overall treatment of the prisoner ordinarily militates against a finding of deliberate indifference.") (internal citations and quotations omitted); Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. Nev. 1990) ("In determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect."); Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. Cal. 1986) ("Plaintiffs' citations to isolated occurrences of neglect do not amount to a constitutional violation.")  Moreover, during this entire period, Plaintiff was receiving medical treatment approved by Dr. Fernandez – Ibuprofen and a splint – treatment that Dr. Fernandez knew to be acceptable in cases such as Plaintiffs'.  Dr. Puri had never indicated to Dr. Fernandez that surgery was immediately necessary or that a delay would cause Plaintiff harm.  Dr. Puri never prescribed Plaintiff pain medication or stronger pain medication than Ibuprofen.  As such, McGuckin is contrary to Plaintiff's arguments as to the alleged delays in approving Dr. Puri's recommendations.

Plaintiff also relies on Jett v. Penner, 439 F.3d 1091 (9th Cir. 2006), contending that further delays, even after Dr. Fernandez forwarded a recommendation for surgery on August 1, 2005, show that Dr. Fernandez was deliberately indifferent.  In Jett, the plaintiff alleged that prison officials failed to have a prisoner examined by an orthopedist specialist in a timely manner.  On October 27, 2001, the

22

plaintiff injured his thumb. *Id.* at 1094. An outside doctor diagnosed the plaintiff with a broken thumb, prescribed pain medication, placed the thumb in a temporary splint, and advised the plaintiff to see an orthopedic doctor within a week for a follow-up. *Id.* The plaintiff sent various informal notices to inform the prison medical staff regarding his pain and condition, requesting to have his broken thumb set and placed in a cast. *Id.* After two months without a medical examination, the plaintiff was examined by defendant Dr. Penner, a prison doctor, on December 24, 2001. *Id.* Despite Dr. Penner's awareness of the plaintiff's medical needs and the recommendation from a prior doctor that an orthopedist consult was needed, the plaintiff was not sent to an orthopedist for more than three months. *Id.* By April 2002, another prison doctor determined that the plaintiff needed an examination by an orthopedic specialist and submitted an "urgent" request for outside consultation. *Id.* at 1095. Later in April, the specialist determined that the hand was not healing properly and consultation with a hand specialist was needed. *Id.* Dr. Penner again examined the plaintiff in August, October, and November 2002, noting each time that the plaintiff should be examined by a hand specialist but failing to ensure the appointment was scheduled each time. *Id.* Plaintiff eventually received treatment from a hand specialist in May 2003. *Id.*

In coming to the conclusion that a genuine issue of material fact existed as to the plaintiff's Eighth Amendment claim, the court in *Jett* noted that it appeared that all of the medical examinations had reached the same conclusion: that the plaintiff needed to see an orthopedic specialist. *Id.* at 1098. Further, the court reasoned that the jury

could infer that Dr. Penner acted with deliberate indifference because he had previously altered a medical report so that the phrase "no obvious malalignment" was changed to read "no malalignment." Id. at 1098 & n.2. Finally, throughout Dr. Penner's examinations, the x-rays showed that the healing thumb had not aligned properly, thus causing the thumb to be "deformed." Id. at 1098. The court determined that the jury could draw an inference that the delayed treatment caused long-term harm to the plaintiff. Id. The court also determined that the other two defendants could not defeat plaintiff's claims on summary judgment. Id. These two defendants were prison administrators (a warden and a medical administrator) who had received some of plaintiff's complaints about his lack of medical treatment. Id. Neither defendant had taken any action at all to assist the plaintiff in obtaining the medical care he required. Id. The court held that "prison administrators . . . are liable for deliberate indifference when they knowingly fail to respond to an inmate's requests for help." Id.

Jett is distinguishable from this case. In Jett, Dr. Penner failed to schedule an appointment with a specialist for well over a year, despite consistent recommendations from other doctors and his own acknowledgment that the appointments were needed. On the other hand, in this case, Dr. Fernandez approved Ms. Castillo's initial treatment of Ibuprofen and bandages and authorized x-rays within two days of Plaintiff's injury. After the x-rays were taken, Plaintiff was treated with a splint. Dr. Fernandez ensured that Plaintiff was seen by a specialist, Dr. Puri, within two weeks of his injury. Dr. Fernandez then followed the prison's procedures in forwarding Dr. Puri's

24

recommendation for surgery on two occasions, though he knew that using a splint and Ibuprofen was medically acceptable.  Through no fault of Dr. Fernandez, the surgeries were not scheduled as requested, but were scheduled with Dr. Craig by MDI.  At the first appointment with Dr. Craig on September 8, 2005, Dr. Craig requested additional x-rays, but expressly stated that at that time, he saw no need for surgery.  Even after receiving the x-rays at the second appointment, Dr. Craig did not determine that surgery was necessary.  Unlike Dr. Penner in Jett who continued to note a specialist was needed along with noting consistent recommendations from other doctors, in this case, in view of Dr. Craig's hesitation and his own medical knowledge, Dr. Fernandez determined that continuing to use the splint and Ibuprofen was a medically acceptable mode of treatment.[8]  He also became convinced upon reading Dr. Craig's notes and upon Dr. Craig's failure to follow up, that Dr. Craig would not be recommending surgery.

Thus, Dr. Fernandez did not exhibit a pattern of delay in treating Plaintiff's fracture.  In fact, Dr. Fernandez treated Plaintiff almost immediately after Plaintiff's injury, ensured that Plaintiff would see a specialist within two weeks, and took affirmative steps to get Plaintiff surgery when a specialist recommended surgery in May and July.  Due to events outside the scope of Dr. Fernandez's

---

[8] The fact that Dr. Fernandez issued a statement to Plaintiff that he would not be receiving his requested surgery in March, 2006 and that Dr. Fernandez had Plaintiff examined by Dr. Redix in April, 2006 does not suggest that Dr. Fernandez did not make a medical judgment to treat Plaintiff conservatively until March or April 2006.  As asserted by Plaintiff himself, Dr. Fernandez undertook these actions upon the urging of Dr. Fernandez's attorneys, who were retained after Plaintiff filed this suit in February, 2006.

responsibilities and authority, the surgeries were not performed.[9]  Dr. Fernandez then facilitated and reviewed Plaintiff's consultations with Dr. Craig, another specialist selected by MDI.  Subsequently, Dr. Craig, who saw Plaintiff on two occasions in September and October, declined to recommend or perform surgery.  Dr. Fernandez then chose to continue to treat Plaintiff with a splint and Ibuprofen.

### (2)  Acceptable Treatment

Plaintiff has failed to show that in October 2005, over four months after the fracture occurred, Dr. Fernandez chose a medically unacceptable mode of treatment by choosing to keep Plaintiff in a splint and on Ibuprofen.  No specialist, at any point, has indicated that a splint and Ibuprofen was medically unacceptable treatment.  The case at hand can be further distinguished from <u>Jett</u> because unlike in <u>Jett</u>, where the continuing use of a splint and pain medication led to the improper healing of the fracture, using a splint and pain medication to heal Plaintiff's fracture was an appropriate course of treatment under the circumstances.

Furthermore, Dr. Kuschner confirmed Dr. Fernandez's belief that fractures such as Plaintiff's should be treated with a splint and painkillers.  Dr. Kuschner was the only specialist who checked the degree of angulation of Plaintiff's fracture.  As Dr. Puri stated, the degree of angulation is a relevant factor in determining whether surgery is necessary.  However, Dr. Puri did not measure the degree of angulation, rather, he only examined Plaintiff's hand visually.  Dr.

---

[9] As noted earlier, MDI scheduled the surgery that Dr. Puri recommended with Dr. Craig.  One possible reason for this is that Dr. Puri stopped providing services through MDI sometime in July 2005.  In any event, as the record shows, Dr. Fernandez had no control over MDI's actions and no authority to schedule the appointments.

Kuschner relied on a text *Green's Operative Hand Surgeon*, the 2005 edition of which stated that the degree of angulation of a ring finger fracture must be greater than 30 degrees to warrant surgery. Plaintiff's degree of angulation was only 23 degrees.  Dr. Kuschner also determined that based on Plaintiff's x-rays, other factors indicating a possible need for surgery, such as rotatory mal-alignment, were not present.  Furthermore, as Dr. Kuschner testified, any pain Plaintiff experienced was a necessary part of the healing process and the pain diminishes as the fracture heals.

Thus, in light of the evidence produced at trial, the Court concludes that Plaintiff was given acceptable treatment by Dr. Fernandez.

### (3)  Subjective Component

Finally, even if the Court were to assume Dr. Fernandez delayed Plaintiff's medical care or provided unacceptable treatment, Plaintiff has failed to show that Dr. Fernandez knew of and disregarded an excessive risk to his health.  That is, Plaintiff has failed to show that Dr. Fernandez was both aware of the facts from which Dr. Fernandez could infer that a substantial risk of serious harm existed – that Plaintiff would be in unnecessary pain or face permanent damage to his hand –  and that Dr. Fernandez in fact drew that inference.  Farmer, 511 U.S. at 837.

Plaintiff argues that actions undertaken by Dr. Fernandez to protect himself from liability after Plaintiff filed this lawsuit show that Dr. Fernandez was more than merely negligent and meets the subjective component of deliberate indifference.  At the direction of his attorneys, Dr. Fernandez had Plaintiff visit an additional doctor

and issued a formal rejection of Plaintiff's surgery request.  Finally, Plaintiff argues that the title of a document exchanged between Dr. Fernandez and Dr. Redix, containing "Merino Stupid Letter," shows that Dr. Fernandez purposefully delayed or interfered with Plaintiff's treatment.  The letter was necessitated by demands from Dr. Fernandez's attorneys.[10]

Even if these actions have some probative value, any probative value is substantially outweighed by Dr. Fernandez's overall medical attention to Plaintiff's medical needs.  As discussed earlier, Dr. Fernandez approved and forwarded two surgery requests, and wrote "ASAP" on one request to alert schedulers that a fast approaching date was scheduled.  Moreover, Dr. Fernandez was never aware that a "substantial risk of serious harm existed" and nor did he draw that inference.  Dr. Fernandez believed throughout Plaintiff's treatment that a splint and Ibuprofen was medically acceptable treatment – a belief that was confirmed when no specialist ever stated that the chosen mode of treatment was medically unacceptable.  Dr. Puri, who recommended surgery on two occasions, never prescribed stronger pain medication than that already prescribed such that Dr. Fernandez could draw an inference that Plaintiff was suffering unnecessary pain.[11]  Although Plaintiff complained of pain, as Dr. Kuschner explained, pain is a necessary part of a fracture's healing process.  Thus, Dr. Fernandez did not draw an inference that Plaintiff was being subjected to

---

[10] The Court finds credible Dr. Fernandez's trial testimony that the title of the letter reflected his frustration regarding the litigation and was not intended to indicate that Plaintiff was stupid.

[11] Further, as the Court discusses below, Plaintiff's claims of pain are not credible in light of the record.

unnecessary pain based on Plaintiff's complaints or Dr. Puri's initial surgery recommendations.  Furthermore, the fact that Plaintiff repeatedly sought surgery and none was performed is not a basis for liability.  <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th cir. 1996) ("[A] plaintiff's showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another was insufficient, as a matter of law, to establish deliberate indifference.") (internal quotations omitted).

Dr. Puri also equivocated regarding whether surgery was necessary in his July 12, 2005 notes.  Dr. Puri noted that it was Plaintiff who was insisting on surgery and that there were no guarantees for complete success.  In any event, Dr. Fernandez still deferred to Dr. Puri's recommendation and forwarded the second request for surgery, which again was scheduled with Dr. Craig by MDI.  Thereafter, none of the outside doctors that saw Plaintiff ever recommended surgery.  At this point, Dr. Fernandez did not believe that surgery would be prescribed and continued to treat Plaintiff with Ibuprofen and a splint.

In sum, Plaintiff has not shown that Dr. Fernandez knew of and disregarded an excessive risk to his health.  Instead, the record shows that Dr. Fernandez treated Plaintiff appropriately with a splint and Ibuprofen, and followed Dr. Puri's recommendations.  When the surgery was not scheduled by MDI, he continued to authorize and follow through with specialists' recommendations.  When no other specialist recommended surgery or suggested an alternative treatment, Dr. Fernandez confirmed his initial belief that a splint and Ibuprofen was appropriate treatment.

\\

**(4)  Harm**

Plaintiff must also show that Dr. Fernandez's alleged failure to act caused him harm.  Plaintiff argues he was harmed for two reasons: (1) he suffered *unnecessary* pain because of delays in scheduling hand surgery; and (2) that his hand was permanently damaged because the surgery never took place.  Even presuming that Plaintiff has met his burden in showing that Dr. Fernandez had been deliberately indifferent (which he has not), the Court alternatively finds that Plaintiff has failed to meet his burden to show Dr. Fernandez caused him harm.

Plaintiff argues that he suffered unnecessary pain because he did not receive surgery.  Though Plaintiff submitted numerous complaints to prison officials regarding his pain, the Court  finds these complaints of pain were exaggerated.  Plaintiff's subjective complaints of pain are refuted by objective evidence in the record.  Soon after the fracture, Plaintiff was seen typing at work with both hands despite another employee who was available to assist him.  Additionally, though it is Dr. Puri's normal policy and practice to note his belief that a patient is experiencing pain in the patient's file, he did not do so during his first visit with Plaintiff – when Plaintiff's pain should have been at its peak.  Though Dr. Puri did note that Plaintiff stated a "bump" on his hand was hurting him during his second visit, Dr. Puri did not make an independent evaluation of Plaintiff's pain.  Neither Dr. Puri, nor any other doctors prescribed Plaintiff stronger pain medication than that prescribed by Dr. Fernandez (Ibuprofen).  Further, Drs. Puri and Kuschner confirmed that pain was a necessary part of the healing process and that some pain could not have been avoided.  Dr. Kuschner testified that any pain diminishes as time passes and yet,

Plaintiff continued to complain of pain.  The Court disbelieves Plaintiff's testimony that he was still experiencing pain.

Plaintiff also stated that his hand is deformed and he has a loss of grip strength.  The Court did not find Plaintiff's testimony credible.  Upon a visual examination of Plaintiff's hand at trial, the Court observed no deformity.  Furthermore, Plaintiff's testimony is contradicted by credible expert testimony showing that Plaintiff's hand healed in a medically acceptable fashion.

In any case, even if Plaintiff's testimony is to be believed, the record does not show that surgery would have resolved all the alleged complications.  In fact, Dr. Puri expressly stated surgery was no guarantee after six weeks had passed because the fracture may have begun healing.  Furthermore, every other specialist did not recommend surgery.  Plaintiff has not subsequently had any surgery after being released.

Thus, the Court concludes that Plaintiff has not shown that he suffered unnecessary pain.  The record indicates that Plaintiff's complaints of pain were exaggerated and that any pain Plaintiff felt was a necessary part of the healing process.  Plaintiff's testimony that he currently feels pain is unbelievable in light of contradicting evidence in the record and the Court's observations at trial.  Furthermore, Plaintiff has not shown that his hand is deformed, nor that he has a loss of grip strength.  Plaintiff's testimony on the permanent damage to his hand was incredible, contradicted by the record, and no deformities were noticeable at an examination of his hand at trial.  In any case, even if the alleged pain, deformities, and lack of grip strength existed (which they did not), Plaintiff has not

met his burden in showing surgery would have prevented these alleged harms.

### C. Defendant Allen

In granting partial summary judgment to Defendant Allen, the Court noted that a trier of fact "might infer from Allen's memorandum that Allen had failed to fully discharge her (sic) duties in responding fully and accurately to Plaintiff's administrative complaint." (Doc. No. 131 at 31)  The Court also noted that a trier of fact might infer that "Allen's failure to discuss Plaintiff's need for surgery constituted an intentional attempt to delay or prevent Plaintiff from obtaining [the surgery]." Id.

However, after a thorough review of the record and the facts presented at trial, the Court finds that Plaintiff has not met his burden to show that Defendant Allen's memorandum delayed or prevented Plaintiff from obtaining appropriate medical treatment.  The complaint that instigated Allen's memorandum was submitted on December 28, 2005, after Dr. Fernandez had already made a decision to treat Plaintiff with a splint and Ibuprofen.  The Court has already found that this treatment was medically acceptable.  Allen's memorandum did not interfere with this treatment or cause Plaintiff any medical harm.

Further, even if surgery was Plaintiff's prescribed treatment, Plaintiff has not shown that Allen was deliberately indifferent to Plaintiff's need for medical treatment.  First, Defendant Allen's involvement began long after the pivotal events in this case – Mr. Sterling was the AHSA when Dr. Puri recommended Plaintiff's surgery and when Plaintiff met with Dr. Craig.  Allen was not employed at FCI 1 until November 2005.

Also, in preparing his memorandum, Allen was tasked with investigating Plaintiff's complaint regarding worker's compensation and medical idle status.  Plaintiff requested Allen to ensure that FCI 1 "take the necessary steps to place me on work medical idle and supply me with workman's compensation until I have my hand repaired and I am fully recovered." Ex. 31.  Allen reviewed Plaintiff's medical file, including x-rays, and pointed out what he believed was a likely explanation for Plaintiff's injury, namely, that it was caused by punching someone or something.  His opinion was relevant to determining whether Plaintiff was entitled to worker's compensation.  The report does not mention Plaintiff's surgery, and Plaintiff has not demonstrated that his complaint targeting medical idle status and workman's compensation created a responsibility to do so.

Finally, the analysis above as to Plaintiff's failure to meet his burden to show that Allen's alleged deliberate indifference to his medical needs caused him harm would alternatively absolve Allen of liability.

**D.   Qualified Immunity**

As the Court has found there is no constitutional violation, it need not reach the issue of clearly established law.

//

//

//

//

//

//

//

**III.   CONCLUSION**

For the reasons stated, Plaintiff's claim is DENIED.

The Court ORDERS that Defendants are not liable to Plaintiff, and that Plaintiff take nothing by this action.  Plaintiff's action is dismissed on the merits with prejudice, and FINAL JUDGMENT is entered for Defendants.

IT IS SO ORDERED.

DATED: March 15, 2011

STEPHEN V. WILSON

UNITED STATES DISTRICT JUDGE